## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PEGGY BEERS, Administrator | ) | |
| for the Estate of DANNY WAYNE | ) | |
| BARNES, | ) | |
| and | ) | |
| PEGGY BEERS, on behalf of minor | ) | |
| child, JESSICA ANN BARNES BEERS, | ) | |
| | ) | |
| Plaintiffs. | ) | |
| v. | ) | Case No. 04-CV-0860-CVE-SAJ |
| | ) | |
| PAT BALLARD, Washington | ) | |
| County Sheriff, | ) | |
| JAMES ABRAHAM, Washington | ) | |
| County Jail General Administrator; | ) | |
| and | ) | |
| BD OF COUNTY COMMISSIONERS | ) | |
| OF WASHINGTON COUNTY, | ) | |
| OKLAHOMA, | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

Now before the Court are motions for summary judgment filed by defendant Washington

County Board of County Commissioners ("Board") (Dkt. # 44), defendant Sheriff Pat Ballard (Dkt.

# 46), and defendant Lieutenant James Abraham ("Lt. Abraham") (Dkt. # 48). Plaintiff alleges that

defendants violated constitutional rights in contravention of 42 U.S.C. § 1983. First, plaintiff Peggy

Beers ("Beers"), as Administrator for the estate of Danny Wayne Barnes ("decedent"), alleges that

defendants violated decedent's Eighth Amendment rights by denying him medication and delaying

his medical care. Second, plaintiff alleges, on behalf of Jessica Ann Barnes Beers ("Barnes"), that

defendants deprived Barnes of "the right to ongoing enjoyment and freedom of association with her

father, Danny Wayne Barnes." Dkt. # 64, n.2. Plaintiff has sued Sheriff Ballard in his official and

individual capacities, and Lt. Abraham in his individual capacity. Defendants seek summary

judgment, arguing that there is no underlying constitutional violation and that there is no evidence of causation, thus precluding liability under section 1983.

## I.

On September 12, 2002, decedent was booked into the Washington County Jail and immediately transferred to Osage County Detention Center.  Dkt. # 61, Ex. 6, Booking Report.  Lt. Abraham was the Jail Administrator at the time decedent was incarcerated and was, therefore, in charge of the booking process.  Dkt. # 62, Ex. 8, Deposition of Sheriff Ballard, at 9-13.  During intake, decedent answered the medical questionnaire and disclosed that he suffered from diabetes, high blood pressure, and anxiety, that he had prescription medication, and that he was under the care of three physicians, including Dr. Jerry Jarrell.  Dkt. # 61, Ex. 6, Booking Report, at 4.  While at Osage County Detention Center, decedent ran out of Hydrocodone (pain medication) on September 19, 2002.  He was transferred back to the Washington County Jail on September 20 "due to medical complaints."  Id. at 1.

Decedent filled out a medication request form on September 23, 2002.  Dkt. # 62, Ex. 10, 9/23/02 Washington County Detention Prisoner Medical and/or Medication Request Form.  He directed his request to Jan Willaford, who was a detention officer who acted as assistant to the administration at the time.  Id.; see Dkt. # 63, Ex. 15, Deposition of Officer Willaford, at 14.  On this form, decedent wrote:

> Jan, I am asking you to please help me with my problems will [sic] I am placed in the County Jail.  Thank you.  P.S. A couple of your jailers have not been despencing [sic] my med's [sic] and say they did when they didn't and one other jailer caught them lying on computer.

Dkt. # 62, Ex. 10, 9/23/02 Request Form.  Decedent continued to miss doses of medication following this request.  Dkt. # 47, Ex. 8, Jail Medical Log.

On October 1, 2002, decedent filed a grievance form and addressed it to Lt. Abraham.  Dkt. # 62, Ex. 11, Washington County Sheriff's Prisoner Request and Grievance Form.  While official policy requires a jailer to "deliver[] grievance report without reading, alteration, interference or delay to the Sheriff," Lt. Abraham authorizes jailers to handle grievances without supervision.  See Dkt. # 63, Ex. 13, Washington County Sheriff's Department Operations Manual, at 2; Dkt. # 62, Ex. 9, Deposition of Lt. Abraham, at 93.  Lt. Abraham testified:

> Anytime that the detention officers or the medical officer or Jan Willaford can handle a grievance, even though it's addressed to me, then I have given them that authority to do so.

Id.  Lt. Abraham testified that he never received a copy of decedent's October 1 complaint until this litigation.  Dkt. # 62, Ex. 9, Deposition of Lt. Abraham, at 90-91.

In his October 1 grievance, decedent stated:

> I have not received my pain med's [sic] in over a week nor my blood pressure medication in three days. . . . I have asked to make a phone call to doctor for three days.

Dkt. # 62, Ex. 11, Washington County Sheriff's Prisoner Request and Grievance Form.  At the bottom of this form, Deputy Parker responded:

> You are out of hydrocodone and Jan said we will not provide that: you are welcome to have a family member bring your meds.  You were supposed to bring your meds w[ith] you when you came.

Id.  According to Sheriff Ballard, the jail will provide Hydrocodone and other narcotic-based medication to inmates if prescribed by a physician.  Dkt. # 62, Ex. 8, Deposition of Sheriff Ballard, at 58.  Sheriff Ballard's 1994 procedure manual states that inmates ought to bring their own medication for pre-existing conditions "whenever possible."  Dkt. # 63, Ex. 13, Jail Procedure Manual, at 4.  The Oklahoma State Department of Health regulations require that "[p]rescription

3

medication shall be provided to the prisoner as directed by a physician or designated medical authority." Dkt. # 63, Ex. 20, Unofficial Jail Standards, at 18.

Decedent's other complaints from the October 1 grievance appear to have been partially responded to as the jail's medical log indicates missed doses of pain medication and high blood pressure medication subsequent to this grievance.  Dkt. # 47, Ex. 8, Jail Medical Log, at 8. Decedent's personal physician, Dr. Jarrell, did not receive a call from decedent after decedent's initial booking in September 2002. Dkt. # 61, Ex. 3, Deposition of Dr. Jarrell, at 26.  Plaintiff Beers called Dr. Jarrell on October 1 to request additional medication.  Id.  Decedent was seen by the jail's physician's assistant, John S. Kelley, on October 2 for treatment of sinus congestion. Dkt. # 61, Ex. 5, Deposition of Kelley, at 54.

On October 16, decedent filled out another medication request form.  Dkt. # 47, Ex. 9, 10/16/02 Request Form.  In response to this request, Kelley took decedent's medical history and prescribed Benadryl for sinus pressure. Dkt. # 61, Ex. 5, Deposition of Kelley, at 36-37.  Decedents' medical requests put jail staff on notice that decedent was not receiving prescribed medication.  Lt. Abraham explained that an inmate may miss doses of medication if guards are called away to counteract a fight or address a different immediate safety concern.  Dkt. # 62, Ex. 9, Deposition of Lt. Abraham, at 91.  However, defendants do not argue that this occurred in relation to decedent's alleged denial of medication or delay of medical care.

Beers visited decedent on October 18.  She testified that she did not bring medication and that she did not observe anything wrong with him at that time.  When asked why she did not inquire about her brother's health condition, she replied that "it's not my job." Dkt. # 47, Ex. 5, Deposition of Beers, at 81.

4

Between September 20 and October 19, 2002, decedent failed to receive more than twenty-five doses of prescribed medication, including high blood pressure medication. Dkt. # 47, Ex. 8, Jail Medical Log (noting that the jail was "out of" Cozaar and Glucotrol on several occasions). According to Dr. Jarrell, decedent's physician:

> When a patient with high blood pressure doesn't take blood pressure medication, their pressure is going to be higher. . . . With prolonged blood pressure in the range of the Stage 1 and Stage 2 as they're defined by the – these national committees, you have a higher incidence of cardiovascular disease.

Dkt. # 61, Ex. 3, Deposition of Dr. Jarrell, at 26. Cardiovascular disease may "cause a massive hearth attack." Id. at 27. Missed doses of daily prescribed medication put decedent at greater risk of future cardiovascular disease. However, it generally takes years before any effect of missed medications will manifest itself. Id. Therefore, decedent's missed doses in September 2002 most likely did not cause the October 2002 cardiac arrest. It is undisputed that physicians did not attribute decedent's death to denial of medication.

On the morning of October 19, 2002, decedent collapsed in his jail cell. It is undisputed that jailers had conducted a routine visual check of decedent's cell at 8:04 a.m.. At approximately 8:09 a.m., a trustie heard other inmates shout that a man was down and the trustie reported this information via the intercom system to the jailers, Officer Hurd and Officer Inda. Dkt. # 61, Ex. 1, Deposition of Walker, at 5. Both officers were in central command when they learned decedent was down. The parties dispute how quickly officers responded. Officer Inda testified that they promptly called dispatch at 8:11 a.m.. Dkt. # 63, Ex. 18, Deposition of Officer Inda, at 68. The trustie, Leeland Walker, testified that no jailer responded to his announcement for fifteen (15) to twenty (20) minutes. Dkt. # 61, Ex. 1, Deposition of Walker, at 3. The jailers called the Bartlesville Police Department and Officer James Beisley, who was driving nearby, was able to be at the scene within

5

minutes.  Dkt. # 47, Ex. 4, Deposition of Officer Beisley, at 18.   The parties dispute when Officer

Beisley arrived.

 Once Officer Beisley entered the jail, Officer Hurd led him to decedent's cell, which was still

locked.  Id.  Officer Beisley saw decedent lying unconscious on the floor and requested that the cell

be opened.  Dkt. # 47, Ex. 4, Deposition of Officer Beisley, at 19.  He then determined that decedent

was not breathing and had no pulse, and requested an ambulance.  Id.  Officer Beisley testified:

> I looked into the cell and I saw Mr. Barnes - - I don't remember exactly how he was
> laying on the floor, but he was down on the floor with a - - he kind of had a blue
> pallor to his skin, so I asked Travis Hurd to go ahead and open the cell up and let me
> in there so I could check on him.

Id. at 18-19.  Officer Beisley asked for a CPR mask, which was delivered but was the wrong size.

Id. at 19.  An inmate volunteered to conduct the respirations while Officer Beisley did compressions.

Id.  They continued to perform CPR in this fashion until the ambulance arrived.  Id.  It is unclear

whether this inmate had any CPR training.

 The ambulance arrived to take decedent to Jane Phillips Medical Center at approximately

8:45 a.m..  While emergency medical technicians were putting decedent on a stretcher, Deputy

Fesler arrived.  Dkt. # 47, Ex. 7, Deposition of Deputy Fesler, at 17.  Deputy Fesler was the deputy

assigned to be on call during this morning shift and Officer Inda had summoned him to the scene.

Id. at 15.  Decedent was formally admitted to the emergency department at 8:55 a.m..  Dkt. # 63, Ex.

16, Code Blue Record Sheet.  Decedent never recovered from the cardiac arrest but entered a

persistent vegetative state.  Dkt. # 63, Ex. 19, Discharge Summary.  Family opted to cease treatment

and decedent died on November 12, 2002.  Id.  Medical reports indicate that decedent suffered from

complications with hypertension, coronary artery disease, and streptococcal.  Id.  An autopsy was

performed and the cause of death was identified as "[h]ypoxic encephalophathy secondary to cardiac

arrest associated with acute myocardial infarction," meaning that decedent died after a blocked artery caused a cardiac arrest, leading to inadequate oxygen delivery to the brain.  Dkt. # 61, Ex. 3, Deposition of Dr. Jarrell, at 30.

Washington County requires all jail personnel to be certified in first aid and cardiopulmonary resuscitation (CPR) prior to employment.  Dkt. # 63, Ex. 20, Unofficial Jail Standards, at 21. However, the County's recertification policy for staff is unclear.  For example, Sheriff Ballard was first certified in CPR in 1995 but, as of August 2005, has not had any retraining or continuing education for CPR since 1999.  Dkt. # 62, Ex. 8, Deposition of Sheriff Ballard, at 9.  The Sheriff testified that the county used to require jail staff to update their CPR certification annually, but that the policy changed to require recertification every three years.  Id. at 8.  Sheriff Ballard and the Jail Administrator created the jail manual in 1994 and amended it in 1997.  Dkt. # 62, Ex. 8, Deposition of Sheriff Ballard, at 14.  This manual was in force during the events that concern this litigation. Id.  Jail staff were given copies of this manual and are expected to read through the documents on their own.  Dkt. # 63, Ex. 15, Deposition of Willaford, at 18.

The jail was allegedly understaffed the morning of October 19, 2002, thereby allegedly causing a delay in administration of CPR by requiring on-duty jailers to wait for an off-site officer

to arrive before CPR could be performed while maintaining the safety of the jail.[1]   Decedent's cardiac arrest occurred shortly after 8:00 a.m. on October 19, 2002.  The jail's day shift begins between 6:00 a.m. and 7:00 a.m..  Dkt. # 62, Ex. 9, Deposition of Lt. Abraham, at 66.  The jail procedure is to staff three to five jailers during day shifts.  Id. at 67.  Officer Inda apparently remained in central control, where he was able to continue to monitor jail activity and communicate with others, including calling Deputy Fesler to the scene.  Plaintiff agrees that neither Sheriff Ballard nor Lt. Abraham was personally at the jail on the day of decedent's cardiac arrest.  Dkt. # 47, Ex. 5, Deposition of Beers, at 13-14; Dkt. # 49, Ex. 5, Deposition of Beers, at 126.  Officer Hurd was left alone to respond to decedent's emergency and, for safety purposes, was unable to provide care until another officer arrived.  It is arguable that, if there were three jailers staffed, two could have immediately entered decedent's cell and performed CPR, preventing the additional lapse in time that occurred which possibly decreased decedent's chances of survival.

---

[1]   County policy requires that more than one official be present before opening an occupied jail cell.  Dkt. # 63, Ex. 20, Unofficial Jail Standards, at 8.  "The procedure is that the detention officer has to wait for backup to arrive" before performing CPR on an unconscious inmate.  Dkt. # 62, Ex. 9, Deposition of Lt. Abraham, at 65-66.  As Officer Hurd explained:

> [M]yself and Mr. Inda were the two working, and he was dispatching, and you're not – you cannot leave dispatch due to the 911 phones being there and everything, and I cannot enter a cell unless there's more than one officer there.  So I had to have an officer there, and our deputy had just came [sic] on duty and I knew where his – I knew from where he lived that it'd be faster to get a [Bartlesville Police Department] officer there so we could get quicker medical assistance.

Dkt. # 63, Ex. 14, Deposition of Officer Hurd, at 15.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

In her first claim, plaintiff Beers alleges that defendants are liable under 42 U.S.C. § 1983 for the death of decedent.  Section 1983 provides, in pertinent part,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. §1983.

The Eighth Amendment imposes a constitutional duty on government entities to take "reasonable steps to protect the prisoners' safety and bodily integrity."  Berry v. City of Muskogee, Oklahoma, 900 F.2d 1489, 1499 (10th Cir. 1990).  Plaintiff alleges that defendants Board and Sheriff Ballard, in his official capacity, are liable under section 1983 because "there is a direct causal connection between the municipal policies in question and the constitutional deprivation."  Id. at 1499 (citing City of Canton, Ohio v. Harris, 489 U.S. 378 (1989)).

Before examining the policies governing jail operations, it is necessary to identify those authorities responsible for jail personnel.  Under Oklahoma law, the Sheriff is responsible for jail staff.  Okla. Stat. tit. 19, § 513 (the sheriff shall be liable for the acts of his deputies and jailers). Therefore, Sheriff Ballard is an appropriate party defendant in his official capacity.  The Board is statutorily separate and distinct from the independently elected sheriff.  The Board has no duty to hire, train, supervise, or discipline the county jailers.  Okla. Stat. tit. 19, § 339; see Meade v. Grubbs, 841 F.2d 1512, 1528 (10th Cir. 1988) ("Under Oklahoma law, the Board [of County Commissioners] has no statutory duty to hire, train, supervise, or discipline the county sheriffs or their deputies."). Thus, "unless the Commissioners voluntarily undertook responsibility for hiring or supervising

10

county law enforcement officers, which is not alleged, they were not 'affirmatively linked'" with the alleged constitutional violations.  Id.  Beers admitted that she has no factual basis for her claims against the Board.  Dkt. # 45, Ex. 1, Deposition of Beers, at 111-12.  Therefore, the Court finds that, even assuming, arguendo, that plaintiff can establish an Eighth Amendment violation, plaintiff has failed to present evidence that the Board undertook responsibility for jail officials and, thus, grants the Board's motion for summary judgment (Dkt. # 44).

Plaintiff claims that Sheriff Ballard, in his individual capacity, advanced unconstitutional policies and failed to train jail personnel.  The Sheriff is required to appropriately train "deputies and jailers in accordance with the jail standards promulgated by the State Department of Health."  Okla. Stat. tit. 19, § 513.1.  Similarly, plaintiff alleges that Lt. Abraham, in his individual capacity, supervised staff in a manner which violated decedent's Eighth Amendment rights by altering the grievance process.  The Jail Administrator is "responsible for the facility's medical services and shall develop, with the assistance of a designated medical authority, the facility's health care plan."  Dkt. # 63, Ex. 20, Unofficial Jail Standards, at 18.  However, both officials have claimed qualified immunity from liability under section 1983.  See Hafer v. Melo, 502 U.S. 21, 25-26 (1991).

Under the qualified immunity doctrine, liability may not be imposed on a public employee "for exercise of discretionary authority unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Jantz v. Muci, 976 F.2d 623, 627 (10th Cir.1992) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  A government official is entitled to qualified immunity "in all but the most exceptional cases."  Tonkovich v. Kansas Board of Regents, 159 F.3d 504, 516 (10th Cir.1998).  The doctrine of qualified immunity recognizes a law as "clearly established" if there is Supreme Court or Tenth Circuit law on point.

11

See Murrell v. School District No. 1, Denver, Colo., 960 F.2d 1493, 1498 (10th Cir. 1992).  No such law put Lt. Abraham on notice that his alteration of the grievance process was constitutionally deficient.  Further, once a government official raises the defense of qualified immunity, it shifts to the plaintiff the summary judgment burden, and that burden is "quite heavy."  Jantz, 976 F.2d at 627. Plaintiff fails to meet this burden, as there is no evidence that either Sheriff Ballard or Lt. Abraham exercised his discretion in managing jail operations with the understanding that his actions violated decedent's rights.  See Id.  Therefore, the Court grants summary judgment in favor of Lt. Abraham (Dkt. # 48) and Sheriff Ballard (Dkt. # 46) as to qualified immunity in their individual capacities.

Having granted summary judgment in favor of the Board, Lt. Abraham, and Sheriff Ballard in his individual capacity, plaintiff's only remaining defendant for her first claim is Sheriff Ballard in his official capacity.  In his official capacity, Sheriff Ballard represents Washington County.  See Meade, 841 F.2d at 1529.  It is well-settled law that a municipal entity, such as Sheriff Ballard in his official capacity, may be held responsible "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Monell v. New York City Dep't of Social Services, 436 U.S. 658, 694 (1978).  In order to hold Sheriff Ballard liable under section 1983, plaintiff must first present evidence of an underlying constitutional violation and then plaintiff must present evidence that Sheriff Ballard was responsible for that violation.  See e.g., Hinton v. City of Elwood, Kan., 997 F.2d 774 (10th Cir. 1993).

The underlying constitutional violation, according to plaintiff, is the "deliberate indifference to an inmate's serious medical need" in contravention of the Eighth Amendment.  Mata v. Saiz, 427

F.3d 745, 749 (10th Cir. 2005); see Estelle v. Gamble, 429 U.S. 97, 104 (1976).  In Sealock v.

Colorado, 218 F.3d 1205 (10th Cir. 2000), the Tenth Circuit explained:

> "Deliberate indifference" involves both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994). A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.1999) (quotations omitted)). The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837.

218 F.3d at 1209.  The objective prong is met because the actual harm suffered by decedent was

clearly serious as he suffered cardiac arrest, lapsed into a coma, and eventually died.  See Garrett

v. Stratman, 254 F.3d 946, 950 (10th Cir. 2001) (holding that the substantial harm requirement "may

be satisfied by lifelong handicap, permanent loss, or considerable pain.").  The subjective component

of deliberate indifference is met if the official was "aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Farmer, 511 U.S. at 837.  The inference of knowledge of risk by an official can be based on

circumstantial evidence if the risk is obvious.  Garrett, 254 F.3d at 950.

     The risk of cardiac arrest may be reasonably foreseeable for an inmate with a documented

medical history of high blood pressure and diabetes who has prescribed medication for these

conditions.  Washington County officials were on notice from decedent's intake form that decedent

required diabetes and high blood pressure medication.  They were also on notice from request forms,

grievance forms, and the jail medical log that staff were not supplying decedent with his medication

as prescribed.  While Sheriff Ballard may argue that he had no actual knowledge of decedent's

complaints, Lt. Abraham expressly authorized an alteration to the grievance process which kept the

Sheriff insulated from knowledge of inmate grievances.  If the Sheriff acquiesced in this alteration,

a fact-finder could reasonably infer that Sheriff Ballard had knowledge of the risk of decedent's injury.  Plaintiff has presented evidence "supporting an inference that [the Sheriff] knew about and disregarded a substantial risk of harm to [decedent's] health and safety."  Mata, 427 F.3d at 752.

Having presented evidence of an underlying constitutional violation, plaintiff must present evidence that Sheriff Ballard is responsible under section 1983.  Plaintiff asserts that Sheriff Ballard: established a jail medical procedure contrary to state law; tolerated a custom of failure to monitor inmate's medical conditions; tolerated a custom of unresponsiveness to inmate requests; tolerated a custom of delaying medical care; failed to train staff to respond rapidly to a down inmate; and failed to adequately supervise and staff the jail so as to avoid an unnecessary delay in administration of CPR.  See Monell, 436 U.S. at 692 (section 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights").

First, plaintiff argues that Sheriff Ballard's 1994 procedure manual established an unconstitutional policy by requiring inmates to bring their own medication for pre-existing conditions "whenever possible."  Dkt. # 63, Ex. 13, Jail Procedure Manual, at 4.  However, the highlighted procedure states a preference, not a requirement, and allows for accommodation for pre-existing medical conditions.  Plaintiff has failed to identify any official jail medical procedure policy that might impose section 1983 liability on Sheriff Ballard.

Next, plaintiff argues that Sheriff Ballard tolerated unconstitutional customs among jailers. See Monell, 436 U.S. at 609-91.  To survive summary judgment, plaintiff must present evidence of widespread and persistent violations that constitute "custom" for which defendant may be held liable under section 1983.  See Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996).  Plaintiff alleges that Sheriff Ballard acquiesced in customs of denying requests for prescribed medication,

14

failing to monitor medical conditions, and delaying medical care.  Plaintiff has not presented evidence of failure to monitor medical conditions or delay of medical care beyond the events on October 19, 2002 between 8:04 a.m. and 8:55 a.m..  It is not sufficient to present evidence of an isolated violation.  Lankford, 73 F.3d at 286 (finding that "isolated and sporadic acts" do not amount to a county custom).  Evidence of a single incident of unconstitutional activity is insufficient to assign liability on a municipality, unless that incident was under the direction of final policymakers.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986); Meade, 841 F.2d at 1529.  Therefore, plaintiff's claim of unconstitutional customs of failing to monitor health conditions and delaying medical care do not survive summary judgment.

Plaintiff has presented evidence of ongoing denials of prescribed medication.  "The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." Farmer, 511 U.S. at 832 (internal citations omitted).  Given that imprisonment controls inmates' access to outside resources, jails have a responsibility to provide inmates with basic necessities, such as food, clothing, and medication.  Id.  However, plaintiff admits that there is no medical evidence that decedent died from denial of medication.  Dkt. # 61, Plaintiff's Response to Ballard, at 9. Evidence of causation is required to establish a section 1983 claim.  See Daniels v. Gilbreath, 668 F.2d 477, 480-81 (10th Cir. 1982).  Accordingly, all of plaintiff's claims of unconstitutional customs fail on summary judgment.

Finally, plaintiff alleges that Sheriff Ballard failed to adequately train and staff the jail.  The Supreme Court has held that, even in the absence of an affirmative policy, a failure on the part of a municipality to train employees may, in limited circumstances, provide a basis for liability.  City of Canton, 489 U.S. at 387.  To establish liability based on a policy of inadequate training or

supervision, plaintiff must present evidence that the municipality was deliberately indifferent to a significant risk of serious harm. City of Canton, 489 U.S. at 389 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a policy as defined by our prior cases – can a city be liable for such a failure under section 1983."). A government entity can be liable for deliberate indifference under section 1983 if it has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. See Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 405 (1997) (concluding that a single instance of a sheriff's inadequate screening of a deputy was not sufficient to prove that the municipality caused the injuries).

While it appears that less than an hour passed between an uneventful sight check of decedent's cell and his admission to the hospital, there are genuine issues of material fact as to the alleged delay in administration of CPR, causes of the alleged delay, and any effects of such delay. Evidence of inadequate training and supervision includes the understaffing of the jail on October 19, 2002, the CPR recertification policy of the jail, and the absence of official training as to the jail procedure manual. Further, plaintiff presents genuine issues of material fact as to whether the alleged delay in treatment for inmate's cardiac arrest may have decreased decedent's chance of survival. Therefore, plaintiff's first claim against Sheriff Ballard in his official capacity survives summary judgment as it relates to failure to train or supervise personnel with deliberate indifference to substantial risk of serious harm.

**IV.**

Plaintiff's second claim, on behalf of Barnes, is that defendants "violated Barnes' clearly established Fourteenth Amendment Constitutional right to not be deprived of life or liberty without due process of law and the ongoing enjoyment and freedom of association with her father, the decedent." Dkt. # 81, Amended Complaint, at 7.  See Trujillo v. Bd. of County Commissioners, 768 F.2d 1186 (10th Cir. 1985).  Despite plaintiff's argument to the contrary, the Court finds that defendant has properly moved for summary judgment on this claim.  As the Tenth Circuit stated in Trujillo, the "tort must be intentional, directed at the relationship itself." Trujillo, 768 F.2d at 1190 n.6.  "[A]n allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983." Id. at 1190 ("intent may not be transferred"); see also Archuleta v. McShan, 897 F.2d 495 (10th Cir. 1990) (upholding summary judgment for officers because conduct was not directed toward the child of the man they arrested). Plaintiff has presented no genuine issues of material fact as to defendants' lack of knowledge of decedent's daughter and no evidence that defendants intended to interfere with such relationship. Therefore, the Court grants summary judgment in favor of all defendants as to plaintiff's second claim.

**V.**

Accordingly, the Court hereby **grants** the Board of County Commissioner's motion for summary judgment (Dkt. # 44) and **grants** Lt. Abraham's motion for summary judgment (Dkt. # 48).  The Court **grants in part** and **denies in part** Sheriff Ballard's motion for summary judgment (Dkt. # 46) as follows: It is granted as to Sheriff Ballard's entitlement to qualified immunity in his individual capacity; it is granted as to official policies or customs as an alleged violation of

17

decedent's constitutional rights; and it is granted as to plaintiff's claim on behalf of Barnes.   It is denied as to plaintiff Beers' claim against Sheriff Ballard in his official capacity that he allegedly failed to adequately train or supervise jail personnel with deliberate indifference to substantial risk of serious harm to decedent in violation of the Eighth Amendment.

      **IT IS SO ORDERED** this 29th day of December, 2005.


CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

18